RECEIVED IN
COURT OF CRIMINAL APPEALS

May 28, 2015

ABEL ACOSTA, CLERK

WR-73,484-02
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 5/28/2015 10:40:39 AM
Accepted 5/28/2015 11:10:35 AM
ABEL ACOSTA
CLERK

**IN THE
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS**

EX PARTE

§
§
§          NO.   WR-73,484-02
§
§
NEAL HAMPTON ROBBINS                    §

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**SUCCESSIVE APPLICATION FOR A WRIT OF HABEAS CORPUS
IN CAUSE NO. 98-06-0075-CR FROM THE
410TH JUDICIAL DISTRICT COURT OF MONTGOMERY COUNTY**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**AMICUS CURIAE SUPPLEMENTAL BRIEF
BY THE INNOCENCE PROJECT OF TEXAS**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**GARY A. UDASHEN
Bar Card Number 20369590**

**SORRELS, UDASHEN & ANTON
2311 CEDAR SPRINGS ROAD
SUITE 250
DALLAS, TEXAS 75201
(214) 468-8100
(214) 468-8104 FAX**

**BOARD PRESIDENT
INNOCENCE PROJECT OF TEXAS**

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................. i

INDEX OF AUTHORITIES. .................................................................. ii-iii

STATEMENT BY AMICUS CURIAE PURSUANT TO T. R. APP. P. 11 . ......... 2

ISSUE PRESENTED ...................................................................................... 2-3

SUMMARY OF THE ARGUMENT . .................................................... 3-5

ARGUMENT ................................................................................................ 5

      a.     H.B. 3724 . ............................................................ 5-7

      b.     Hair Review ........................................................ 7-8

      c.     *Ex Parte Keller* .................................................. 8-9

      d.     National Attention . ........................................... 9-10

      e.     Legislative Intent ............................................. 10-14

      f.     Texas Leads The Way . ..................................... 14-17

CONCLUSION AND PRAYER FOR RELIEF ............................................... 17

CERTIFICATE OF SERVICE. .................................................................... 18

CERTIFICATE OF COMPLIANCE ............................................................. 19

# INDEX OF AUTHORITIES

**Cases**                                                            **Page**

*Ex Parte Daniel Keller*, No. WR-36,232-02 (May 20, 2015) .................... 4, 8, 9, 17

*Ex Parte Frances Keller*, No. WR-36,864-02 (May 20, 2015) . ................ 4, 8, 9, 17

*Ex parte Henderson*, 384 S.W.3d 833 (Tex. Crim. App. 2012) . .......................... 16

*Ex Parte Moussazadeh*, 361 S.W.3d 684 (Tex. Crim. App. 2012)........................ 17

*Ex Parte Neal Hampton Robbins*, ___ S.W.3d ___
(Tex. Crim. App. Nov. 26, 2014) ...................................................................... 3-15

*Ex Parte Robbins*, 360 S.W.3d 446 (Tex. Crim. App. 2011). .. 5, 7, 9, 11, 12, 16, 17

*Tillman v. State*, 354 S.W.3d 425 (Tex. Crim. App. 2011) . ................................. 16

*Winfrey v. State*, 323 S.W.3d 875 (Tex. Crim. App. 2010) . ................................. 16

**Codes and Rules**

Tex. Code Crim. Proc. Art. 11.073 . ................................................................ Passim

Tex. Code Crim. Proc. Art. 38.01 . ......................................................................... 15

Tex. Code Crim. Proc. Art. 38.141 . ....................................................................... 15

Tex. Code Crim. Proc. Art. 38.20 . ......................................................................... 15

Tex. Code Crim. Proc. Art. 38.43. .......................................................................... 15

**Published Articles**

"FBI admits flaws in hair analysis over decades,"
*Washington Post*, April 18, 2015. ............................................................................ 7

FBI/DOJ Microscopic Hair Comparison
Analysis Review, Press Release.................................................................. 7

"In Texas, A New Law Lets Defendants Fight Bad Science,"
Atlantic Magazine, February 28, 2014................................................. 16

*Lindell*, "1992 sex case over day care tossed"
(www.statesman.com May 21, 2015). ...................................................... 9

The Innocence Project, Understand the Causes:  Unreliable-Limited Science....... 14

## **Miscellaneous**

House Bill 48. ....................................................................................... 15

House Bill 3724. .............................................................................. 4, 5-7

House Research Organization Bill Analysis of SB344.......................................... 13

Senate Bill Analysis . ............................................................................ 6

# IN THE
## COURT OF CRIMINAL APPEALS
## AUSTIN, TEXAS

EX PARTE

§
§
§     NO.   WR-73,484-02
§
§
NEAL HAMPTON ROBBINS                              §

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## SUCCESSIVE APPLICATION FOR A WRIT OF HABEAS CORPUS
## IN CAUSE NO. 98-06-0075-CR FROM THE
## 410TH JUDICIAL DISTRICT COURT OF MONTGOMERY COUNTY

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## AMICUS CURIAE SUPPLEMENTAL BRIEF
## BY THE INNOCENCE PROJECT OF TEXAS

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:

**NOW COMES** The Innocence Project of Texas and submits this Amicus Curiae Supplemental Brief in the above styled and numbered case. This brief supplements the previous Amicus Curiae Brief filed by the Innocence Project of Texas prior to original submission of this case.

## Statement by Amicus Curiae Pursuant to T. R. App. P. 11

This brief is submitted on behalf of the Innocence Project of Texas. The Innocence Project of Texas is a 501(c)(3) non-profit organization whose work involves seeking to free wrongfully convicted persons from prison and seeking reforms in the Criminal Justice System that will decrease the chances of innocent persons being convicted. The Innocence Project of Texas Board of Directors is composed of volunteer attorneys from around the State of Texas. This brief is submitted by Gary A. Udashen, Board President of the Innocence Project of Texas, and no fee has been paid to any attorney for preparation of this Amicus Curiae Brief.

The Innocence Project of Texas has been active in attempts to combat the use of invalid and discredited scientific evidence in the criminal courts of Texas. Art. 11.073, Tex. Code Crim. Proc. is one of the most important steps taken in support of this goal. The Innocence Project of Texas was one of the groups that supported the passage of the statute and several officers and directors of the Innocence Project of Texas testified to the Legislative committees that considered Art. 11.073.

## ISSUE PRESENTED

Art. 11.073, by its plain language, covers the factual situation presented in the Robbins case. Moreover, the clear intent of the Legislature, in enacting Art. 11.073, was to provide relief under the factual scenario presented in this case. For these

reasons, the Court's opinion in *Robbins II*[1] was correct and should be reaffirmed on rehearing.

## SUMMARY OF THE ARGUMENT

The Court's opinion in *Robbins II* correctly analyzes the language and legislative intent of 11.073.

The plain language of Art. 11.073 provides a vehicle for providing relief in this case. Dr. Moore's disavowal of her previously expressed opinion on the manner and cause of the complainant's death was based on a change in Dr. Moore's own scientific knowledge. Dr. Moore followed a normal scientific method of analysis in conducting her re-evaluation of the case. She noted that she had eight years of additional experience and training. She became aware of the review and analysis of this case by other, more qualified and experienced medical examiners, who concluded that the proper cause and manner of death was undetermined. Following her consideration of these critical factors, Dr. Moore opined that her initial conclusion as to the manner and cause of death was incorrect and should have been listed as undetermined. This is a classic employment of the scientific method of analysis, resulting in a change in the scientific knowledge available on this case. That is precisely what Art. 11.073 requires in order for relief to be granted. This change of the scientific knowledge was not available to be offered by Robbins at his trial and contradicts the scientific

---

[1] *Ex Parte Neal Hampton Robbins*, ___ S.W.3d ___ (Tex. Crim. App. Nov. 26, 2014) (not yet published) (*Robbins II*).

evidence relied on by the State at trial.

Moreover, to the extent that there is any ambiguity concerning the precise meaning of Art. 11.073, and its application to the facts here, the legislative history provides the answers. The Legislature, in enacting 11.073, was fully aware of the Court's opinion in the first Robbins writ. The Robbins case was the focal point of much of the discussion surrounding this bill and it is clear that, by enacting Art. 11.073, the Legislature intended to provide a clear legal ground for relief for Robbins, and those similarly situated, based on the change in the scientific evidence underlying this conviction.

Additionally, since the State moved for rehearing on this case, the landscape has further changed in support of the Court's opinion granting relief in *Robbins II*. First, the Legislature enacted H.B. 3724, which amended Art. 11.073 to codify the majority opinion granting relief in *Robbins II*. Secondly, the FBI and Justice Department have issued a press release stating that their preliminary review of hair analysis testimony for a 20 year period ending around 2000 shows that in 95% of the cases incorrect scientific testimony was presented. This was testimony consisting of bad science, presented by bad scientists. Third, this Court issued orders in *Ex Parte Daniel Keller*, No. WR-36,232-02 (May 20, 2015) (not designated for publication) and *Ex Parte Frances Keller*, No. WR-36,864-02 (May 20, 2015) (not designated for publication). In the *Keller* cases, the Court granted habeas relief when a medical doctor admitted having provided incorrect testimony at trial. This is precisely the situation on which

this Court denied relief in *Robbins I*.[2]

## ARGUMENT

Neal Robbins quest for justice has been long and frustrating. Everybody seemingly agrees that he was convicted based on invalid scientific testimony that did not withstand the test of time. Yet, years later, the courts are still considering, and reconsidering, whether this indisputable fact is enough to warrant a new trial.

In November of 2014, it appeared that this Court had finally and fairly answered this question by vacating this conviction and granting habeas relief. Nevertheless, Robbins is once again before the Court for a reconsideration of its decision in *Robbins II*.

Since November, and since the filing and granting of the State's rehearing motion, there have been several significant events that demonstrate that the Court got it right in *Robbins II*.

### a. H.B. 3724

First, the Texas Legislature recently, and overwhelmingly, passed H.B. 3724. This bill amended Art. 11.073, Tex. Code Crim. Proc. in order to ensure that the majority opinion in *Robbins II* remains the law. The language of this amendment is:

> (d) In making a finding as to whether relevant scientific evidence was not ascertainable through the exercise of reasonable diligence on or before a specific date, the court shall consider whether the <u>field of</u> scientific knowledge, <u>a testifying expert's scientific knowledge</u>, or <u>a</u>

[2]*Ex Parte Robbins*, 360 S.W.3d 446 (Tex. Crim. App. 2011) (*Robbins I*).

<u>scientific</u> method on which the relevant scientific evidence is based has changed . . . (emphasis added)

In particular, this amendment states that a change in "a testifying expert's scientific knowledge," is covered under 11.073. This simple language was a codification of the majority's decision in *Robbins II*, and was written with one purpose in mind:  to make it clear that the Court's prior interpretation of 11.073 was correct. The Legislature was well aware of the Court's consideration of the State's motion for rehearing, and of the position taken by three of the four dissenting judges that 11.073 did not cover the *Robbins* case.[3]  In codifying by statute the majority's interpretation of 11.073, the legislature made its position clear:  11.073 covers Robbins and the Court properly interpreted the statute in *Robbins II*, in granting relief.[4]

Of course, if the State had not sought rehearing and the Court not granted the motion, there would have been no need to amend 11.073.  This is because the Court's opinion in *Robbins II* properly interpreted the statute.  However, in light of the disagreement among the judges of this Court and the pendency of the State's request for a do-over, the Legislature once again stepped in to remove any ambiguity in the statute, real or imagined.

The original enactment of 11.073 was a similar move by the Legislature in

---

[3]Judge Meyers dissent, in which no other member of the Court joined, concludes that the Legislature exceeded its authority in enacting Art. 11.073.

[4]The Senate Bill Analysis states:  "H.B. 3724 simply codifies the recent court decisions and clarifies that the legislative intent in enacting Article 11.073 included not only discredited science but also the testimony that was based on discredited science."

response to this Court's denial of relief in *Robbins I*. When the Court denied relief om *Robbins I*, the Legislature responded by finally enacting Art. 11.073 to ensure that Robbins, and those similarly situated, would have a vehicle for post-conviction relief. The judges on the court have expressed differing opinions on the legislative intent in the original enactment of 11.073. Nevertheless, there can be no real doubt that the *Robbins I* decision was the "tipping point" behind the enactment of the statute. *See Robbins II*, Judge Cochran concurring. *Robbins II* at p. 19.

**b.    Hair Review**

The second major event that has occurred since the State sought rehearing is a further national awareness of the problem of both bad science and bad scientists in criminal cases. In April of this year, the U. S. Justice Department and FBI issued its preliminary assessment of the review of hair comparison cases over a 20 year period before 2000. *See Washington Post*, April 18, 2015, "FBI admits flaws in hair analysis over decades."[5] The federal government's own conclusion was that 95% of these cases involved incorrect and invalid testimony. While it is yet to be determined to what extent this testimony was deliberate false testimony, as opposed to a misunderstanding of the science, there is no question that many defendants, in Texas

---

[5]http://www.washingtonpost.com/local/crime/fbi-overstated-forensic-hair-matches-in-nearly-all-criminal-trials-for-decades/2015/04/18/39c8d8c6-e515-11e4-b510-962fcfabc310_story.html (last visited May 27, 2015). *See also*, FBI/DOJ Microscopic Hair Comparison Analysis Review, Press Release,
http://www.fbi.gov/about-us/lab/scientific-analysis/fbi-doj-microscopic-hair-comparison-analysis-review (last visited, May 27, 2015)

and elsewhere, were convicted based on this invalid scientific testimony. There is also a question of how much of this invalid testimony is attributed to a scientific witness misunderstanding and misstating the then-current science and how much is based on new scientific techniques. Nevertheless, it is clear that the interpretation embraced by the dissenting judges in *Robbins II*, and advanced by the State on rehearing, could well result in numerous habeas applicants being denied relief under 11.073, on the theory that a scientist giving incorrect testimony, and later, upon further study and review, realizing the testimony was not correct, does not provide a basis for relief under 11.073.

c.    ***Ex Parte Keller***

The third significant event since the granting of the State's motion for rehearing is the Court's opinion in the Frances and Daniel Keller cases. *Ex parte Daniel Keller*, No. WR-36,232-02 (May 20, 2015) (not designated for publication); *Ex parte Frances Keller*, No. WR-36,864-02 (May 20, 2015) (not designated for publication). In *Keller*, the Court granted post-conviction relief based on the presentation of false evidence. Specifically, the Court found the following:

> "Dr. Mouw testified at Applicant's original trial that he observed physical indications of sexual abuse in the complainant. Dr. Mouw now has recanted that trial testimony. The trial court held a hearing during which Dr. Mouw testified that his testimony at Applicant's initial trial was misleading and that he now believes that what he believed to be trauma was actually a normal variation in the complainant's anatomy." *Keller*, slip opinion at 1-2.

This is, in fact, precisely the same situation in which the Court denied relief in

*Robbins I.* In *Robbins I*, Dr. Moore's false and misleading testimony was that the cause of death was asphyxia related compression of the chest. She later re-evaluated her testimony and concluded that her previous testimony was wrong. As Judge Johnson explained in her concurring opinion in *Robbins II*:

> "At the time of the original trial, Dr. Moore had only 18 months experience as an associate medical examiner and had been cited for defective and improper work. With eight more years experience, she testified that she believed that the cause of the child's death could not be determined." *Robbins II*, at p. 12.

There is no principled distinction to be made between the facts of *Robbins I* and those in *Keller*. Both involve a medical doctors reconsideration, and ultimate recantation of their expert trial testimony.[6]

To grant relief in a situation mirroring that of *Robbins I*, yet denying the same relief to Robbins, calls into question whether Robbins received a fair evaluation of his claim in his first writ.[7] Robbins has asked the court to reconsider, on its own motion, its order denying relief in *Robbins I*. The *Keller* case is certainly a compelling reason for the Court to do so.

### d. National Attention

Additionally, the enactment of Art. 11.073, as well as the decision in *Robbins*

---

[6] *See also Lindell*, "1992 Sex Case Over Day Care Tossed" ([www.statesman.com](www.statesman.com) May 21, 2015) (last visited May 27, 2015) ("Dr. Michael Mouw later admitted that inexperience led him to misidentify normally occurring conditions as evidence of sexual abuse in a 3-year-old girl."

[7] It is important to note that Judge Price, who retired from this Court on December 31, 2014, supplied the fifth vote joining Judge Meyers' majority opinion in *Robbins I*.

*II*, has drawn nationwide attention and praise. In fact, Art. 11.073 was the first statute of its kind, one which statutorily recognized that presentation of bad scientific testimony has resulted in invalid and unsupportable convictions and providing a remedy for this injustice. The Court's opinion in *Robbins II* was widely disseminated and discussed. Other states are looking to Texas, and how Texas interprets this important provision of writ law will influence and guide other states.

**e. Legislative Intent**

In his lead opinion for the Court in *Robbins II*, Judge Womack found the language of Art. 11.073 to clearly apply to the medical examiners reconsideration of her faulty opinion that the child's death was a homicide caused by asphyxia by strangulation. Regarding the medical examiner, Judge Womack stated:

> "Her new opinion that the cause of death is 'undetermined,' which the applicant argues is the 'change in scientific knowledge,' is also an inference or assertion supported by appropriate validation based on the scientific method. Moore's revised opinion on the cause of death satisfies the requirements to be called 'scientific knowledge,' and thus falls within the language of article 11.073. Moore's opinion labeling cause of death as 'undetermined' was not available at the time of trial because her scientific knowledge has changed since the applicable trial date." (*Robbins II* at p. 10)

In reaching this conclusion, Judge Womack's lead opinion rejected the State's contention that there was an ambiguity in the statute. Rather, the plain meaning of the statute was found to cover the facts in this case.

In contrast to Judge Womack, Judge Keasler's dissent argued that legislative history showed a legislative intent to exclude the *Robbins* case from the reach of

11.073. Judge Keasler's dissent asserted:

"Article 11.073's legislative history suggests that its aim is to provide an avenue of relief for those convicted on science or scientific methodology subsequently found to be unsound, not an individual expert's changed testimony when the underlying science or methodology of that opinion remains valid." (*Robbins II* at 24)

While the majority opinion in *Robbins II* was correct in concluding that a resort to the legislative history is not necessary based on a clear application of the language of 11.073, nevertheless, it is obvious that the Legislature believed that it was providing a statutory remedy for the denial of relief in *Robbins I*. In fact, Judge Cochran, in her concurring opinion in *Robbins II*, made it clear that the court's decision in *Robbins I* was the "poster child for enactment of Article 11.073." (*Robbins II* at p. 13).

Judge Cochran further wrote in *Robbins II*:

"I join the majority opinion. I write separately to respectfully disagree with the State's contention that the plain language and legislative history of Article 11.073 'demonstrate a legislative intent to provide a remedy when there is a generally accepted scientific advance or breakthrough in a discipline of forensic science,' rather than a change in the State's scientific expert's opinion. I think that providing relief from 'bad' scientific testimony and righting the wrong of *Robbins* was 'the tipping point' for passing the statute. (*Robbins II* at p. 13)
. . .
Dr. Moores later re-evaluation of her opinion - putting aside advocacy for one party and seeking more information to reach a more accurate result - is the hallmark of 'good' scientific methodology:

> Scientists continually observe, test, and modify the body of knowledge. Rather than claiming absolute truth, science approaches truth either through breakthrough discoveries or incrementally, by testing theories repeatedly.

It is not surprising, then, that the Texas Legislature would authorize this court to review convictions based upon an expert's 'scientific knowledge' that the expert has since repudiated or contradicted based on her further testing, review, and experience. Indeed, what would not make sense is for the Legislature to be concerned about the reliability of general fields of forensic science, but unconcerned about the reliability of a forensic scientist's specific testimony. Regardless of whether a conviction is based on an unreliable field of science or unreliable scientific testimony, the result is the same; an unreliable verdict that cannot stand the test of time. It is built upon the shifting sands of 'junk' science or a 'junk' scientist, and it is the purpose of Article 11.073 to provide a statutory mechanism for relief and a retrial based upon 'good' science and 'good' scientific testimony." (*Robbins II* at p. 21)

Judge Johnson's concurring opinion in *Robbins II* further explained that, "'Bad science' and 'bad scientists' are inseparable." (*Robbins II* at p. 12)

She went on to conclude:

"Because evidence is what is presented at trial by a witness and is therefore limited by the personal knowledge of that witness, logically the statute must be intended to address the personal knowledge of scientific witnesses." (*Robbins II* at p. 12)

As discussed in the various opinions, this statute was introduced in both the 2009 and 2011 legislative sessions but did not become law. The major change in the Texas landscape on new scientific evidence between the end of the 2011 legislative session and the 2013 legislative session was the Court's opinion in *Robbins I*. This 5 - 4 decision caused a stir statewide, as well as in the Legislature. The question that the Legislature was faced with was whether Texas law would provide a remedy for someone in Robbins' situation.

Clearly, the Legislature took up the challenge and intended Art. 11.073 to apply

to Robbins and others in this position. The legislative history, including the testimony presented to the relevant committees, makes this obvious. Moreover, the House Research Organization Bill Analysis of SB344, which became Art. 11.073, stated the following:

> "Recent case law and judicial opinion have identified weaknesses in the current habeas corpus statute, noting issues that include the absence of statutory grounds upon which to grant relief, the speed of changing science that serves as the foundation of a conviction, and technical testimony that may change with scientific discovery. In one case, recanted testimony by a medical examiner established the basis of the state's case with respect to the cause and manner of death, without which it would not have obtained a conviction. The Texas Court of Criminal Appeals voted against granting a new trial, with the majority finding no path to habeas relief under current law. The question was raised as to how the criminal justice system should address scenarios in which scientific experts sincerely thought something was true at the time they testified, but the science and the experts' understanding and opinions had changed."

In her concurrence *Robbins II*, Judge Cochran aptly summed up the legislative history as follows:

> "It cannot be doubted that the Legislature had this very case in mind when it debated and enacted what is now Article 11.073. And, during the legislative session, Senator Whitmire told the Texas Tribune that 'several recent Court of Criminal Appeals decisions may make [SB 344] more likely to pass.' The *Robbins* and *Henderson* cases raised 'a novel and difficult issue for the criminal-justice system':
>
>> When scientific experts honestly and sincerely thought 'X' was true at the time they testified, but the science has changed or the experts' understanding of the science has changed and their opinions have changed, what cognizance of that change should the criminal justice system take long after a person has been convicted."

In *Robbins*, this Court chose finality over accuracy; in *Henderson* we did the opposite, and in 2013, the Texas Legislature also chose accuracy over finality by enacting Article 11.073. *(Robbins II* at p. 20)

Moreover, Judge Johnson noted, in her concurring opinion in *Robbins II*:

"The various positions on statutory interpretation seem to agree that the legislative history indicates that the intent of this statute is to provide relief to those who were convicted on science or scientific methodology that is now known to be unsound." (*Robbins II* at p. 11)

Her concurring opinion concluded that,

"The legislature has made it clear that advances in DNA technology may be the basis for re-examining convictions. Advances and changes in other forms of scientific knowledge, and thus in scientific testimony from individuals, should also be available as bases for re-examination of convictions." (*Robbins II* at p. 13)

Certainly, as the bill analysis stated, and as Judges Cochran and Johnson explained, Art. 11.073 was expressly designed to address *Robbins*. Any suggestion to the contrary is belied by the well documented legislative history.

## f.     Texas Leads The Way

That the Legislature chose to address the gap in the law exposed by the first Robbins' opinion is not surprising.[8] As Judge Cochran stated in her concurrence in *Robbins II*, "Over the past decade, Texas has been a national leader in addressing wrongful convictions and recognizing how bad science can lead to wrongful

---

[8]Unreliable or improper forensic science has appeared in more than 50% of DNA exonerations. *See* The Innocence Project, Understand the Causes: Unreliable-Limited Science (http://www.innocenceproduct.org/understand/Unreliable-Limited-Science.php.) The Tim Cole Advisory Commission on Wrongful Convictions recognized this by recommending that Chapter 11 of the Code of Criminal Procedure be amended to address changing scientific evidence.

convictions." (*Robbins II* at p. 13)

The public policy interests of the state have been expressed repeatedly by the Texas Legislature. For instance, the Legislature, with the support and signature of Governors Bush and Perry, has passed numerous laws designed to address the problem of wrongful convictions. These include Chapter 64 of the Code of Criminal Procedure concerning DNA testing, the amended Art. 39.14 (The Michael Morton Act) concerning discovery in criminal cases, Art. 38.43 of the Code of Criminal Procedure concerning retention of biological evidence, Art. 38.01 concerning the establishment of the Texas Forensic Science Commission, Art. 38.20 concerning photographic and live lineup procedures and Art. 38.141 requiring corroboration of the testimony of an undercover informant. Art. 11.073 is another piece of legislation expressing the pro-active approach taken by the State of Texas to address these issues. Additionally, the Texas Legislature created the Tim Cole Advisory Commission on Wrongful Convictions to review the causes of wrongful convictions and recommend legislative solutions. In just the last few days, the Texas Legislature enacted H.B. 48, which establishes the Tim Cole Exoneration Commission to study the causes of wrongful convictions.

Judge Cochran's concurring opinion also recognized the National Academy of Science Report that criticized the scientific basis for forensic testimony as a factor leading to the enactment of 11.073. (*Robbins II* at p. 14)

This Court has also addressed these issues. In addition to the numerous cases

reversing convictions based on new evidence of innocence, the Court formed the Texas Criminal Justice Integrity Unit. This group was tasked with the job of examining and studying the causes of wrongful convictions. The Court has also addressed these issues in opinions in cases such as *Tillman v. State*, 354 S.W.3d 425 (Tex. Crim. App. 2011) (eyewitness identification); *Winfrey v. State*, 323 S.W.3d 875 (Tex. Crim. App. 2010) (dog sniff lineups); and *Ex parte Henderson*, 384 S.W.3d 833 (Tex. Crim. App. 2012) (child head injuries).

The Court's opinion denying relief in *Robbins I* was an outlier from this forward march by the Texas courts and Legislature. The Legislature was faced with a choice of addressing this gap in the law or allowing this opinion to stand in contrast to the clear trend of Texas law. The Legislature chose to rectify what it perceived to be the unfairness of *Robbins I*, and the potential effect of the Court's opinion on other cases. Thus, Art. 11.073 became part of the jurisprudence of the State.

The enactment of Art. 11.073 has garnered national attention and praise for Texas. On February 28, 2014, in the Atlantic Magazine, a story was published entitled, "In Texas, A New Law Lets Defendants Fight Bad Science." This story describes Art. 11.073 as, "[A] ground breaking new Texas law, the only one of its kind in the nation, which recognizes that science can get it wrong."[9] The article quotes Mike Snedeker, President of the non-profit National Center for Reason and

---

[9]http://www.theatlantic.com/national/archive/2014/02/in-texas-a-new-law-lets-defendants-fight-bad-science/283895/ (Feb. 28, 2014) (last visited May 27, 2015).

Justice, describing the new law "as elegant and straightforward and "phenomenally important, not the least because it clarifies and builds on existing due process rights." Referring to the law, Snedeker described Texas as a "beacon of legal progress." In fact, Texas is a beacon of legal progress, and Art. 11.073 is just one of the many ways that this is true.

## CONCLUSION AND PRAYER FOR RELIEF

By enacting Art. 11.073, the Texas Legislature has stated its position that discredited and unreliable science and scientists should not be a basis to hold a man in prison. A fair and common sense application of Art. 11.073 to Neal Robbins' case must result in the granting of relief in this case.[10] That is what the Legislature intended and what the law directs. For this reason, Amicus Curiae, The Innocence Project of Texas, urges the Court to grant the requested relief and vacate the conviction in this case.

Respectfully submitted,

/s/ *Gary A. Udashen*
GARY A. UDASHEN
Bar Card Number 20369590

SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road, Suite 250
Dallas, Texas 75201

---

[10]The granting of Robbins' motion for the Court to reconsider its decision in *Robbins I* on its own motion is an alternative ground for vacating his conviction. This argument is also meritorious, particularly in light of the recent *Keller* opinion granting relief to Daniel and Frances Keller. *Ex Parte Moussazadeh*, 361 S.W.3d 684, 687 (Tex. Crim. App. 2012).

(214) 468-8100
(214) 468-8104 Fax

BOARD PRESIDENT
INNOCENCE PROJECT OF TEXAS

Attorney for Amicus Curiae
The Innocence Project of Texas


## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and correct copy of the foregoing Amicus Curiae Brief on Court's Consideration on Rehearing by the Innocence Project of Texas was mailed to the Montgomery County District Attorney's Office, 301 North Thompson, Conroe, Texas 77301, and Brian Wice, Attorney for Applicant Neal Hampton Robbins, The Lyric Centre, 440 Louisiana, Suite 900, Houston, Texas 77002-1635, on this the 28th day of May, 2015.

/s/ *Gary A. Udashen*
GARY A. UDASHEN

## CERTIFICATE OF COMPLIANCE

Pursuant to Tex. R. App. Proc. 9.4(e)(i)(2), undersigned counsel certifies that this brief complies with the type-volume limitations of Tex. R. App. P. 9.4(e)(i)(2).

1. This brief complies with the type-volume limitation of Tex. R. App. P. 9.4(e)(i)(2) because this brief contains 4,324 words, excluding the parts of the brief exempted by Tex. R. App. P. 9.4(e)(i)(2).

2. This brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) and the type style requirements of Tex. R. App. P. 9.4(e) because this brief has been prepared in a proportionally spaced typeface using Wordperfect X5 in 14 point Times New Roman.

_/s/ Gary A. Udashen_
GARY A. UDASHEN